UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. |
| | ) | |
| v. | ) | Violations: |
| | ) | 18 U.S.C. § 1349 |
| UCHE BEN ODUNZEH, | ) | (Conspiracy to Commit Health Care Fraud) |
| Defendant. | ) | 18 U.S.C. § 982(a)(2)(7) |
| | ) | (Criminal Forfeiture) |

## INFORMATION

The United States Attorney informs the Court that all times relevant:

### Defendant

1.  Defendant UCHE BEN ODUNZEH ("ODUNZEH") was a Nigerian national and never a United States citizen. ODUNZEH entered the United States on a visa issued June 24, 2002; that visa expired on June 23, 2004. ODUNZEH has remained in the United States unlawfully since 2004. ODUNZEH currently resides in the State of Maryland.

2.  ODUNZEH was the sole owner, principal, and registered agent of EMERALD MEDICAL SERVICES, LLC ("EMERALD"), an entity registered to do business in the District of Columbia. EMERALD sold durable medical equipment ("DME") such as power wheelchairs and incontinence supplies. PATRICIA MUBANGA CHISANGA was the principal employee of EMERALD, but ODUNZEH had sole signature authority on EMERALD's corporate bank accounts.

3.  In September 2005, when it registered with the District of Columbia, EMERALD's principal place of business in the District of Columbia was 4211 9th Street, NW, Washington, DC. As of 2010, EMERALD's principal place of business in the District of Columbia was 4913 Georgia Avenue, NW, Washington, DC.

## The Medicaid Program

4. Medicaid was a medical assistance program established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid was overseen and administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS"), and provided medical insurance coverage primarily to individuals (referred to as Medicaid "beneficiaries" or "recipients") whose incomes fell below a certain financial threshold as measured against the poverty line. Under the Medicaid Act, each state, and the District of Columbia, was required to promulgate and administer its own plan for medical assistance in accordance with federally established minimum requirements. In the District of Columbia, the Medicaid program was administered by the Department of Health Care Finance ("DC Medicaid"). The DC Medicaid program was jointly funded by the federal government and the District of Columbia, with the federal government paying approximately 70% of the costs of the DC Medicaid program.

5. DC Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b).

6. Entities such as EMERALD that enrolled in Medicaid and provided or purported to provide health care items or services – including as relevant to this case, DME – to Medicare beneficiaries were known as "providers".

7. DC Medicaid contracted with a fiscal intermediary, Affiliated Computer Services, Inc. ("ACS"), to receive, process, and pay Medicaid claims submitted by Medicaid providers. This includes claims for DME such as power wheelchairs and incontinence supplies. DC Medicaid also contracted with the Delmarva Foundation for Medical Care, Inc. ("Delmarva") to, among other things, provide certain quality review and pre-authorization services.

8. Medicaid operated as a vendor payment program, where payments were usually made by ACS directly to providers such as EMERALD, rather than to the Medicaid beneficiary.

9. In order to be eligible to file a claim for payment from DC Medicaid, a DME provider first had to submit an enrollment application to obtain a provider number. In the application, the company agreed to abide by all Federal and local laws, regulations, and program manuals applicable to DME providers. Further, the DME company certified that it understood that payment of a claim by DC Medicaid is conditioned upon the claims and the underlying transactions complying with such laws, regulations, and applicable program instructions, and on the provider's compliance with all applicable conditions of participation in Medicaid.

10. After obtaining a DME provider number, a DME company could then submit or cause the submission of claims to the fiscal intermediary that processed those claims for DC Medicaid. In the District of Columbia, claims for DME were submitted to ACS. However, before seeking payment for DME worth more than $500, Medicaid DME providers were required to submit specific documentation in order to obtain prior authorization from DC Medicaid (or, beginning June 15, 2009, from Delmarva on behalf of DC Medicaid).

11. For DME such as the power wheelchairs at issue in this case, a DME provider seeking prior authorization had to submit a signed physician's order prescribing the DME, a Certificate of Medical Necessity (also known as a CMN or a CMS-843) justifying why the DME was needed, and a DHS-719A (prior authorization request). DC Medicaid and Delmarva relied on these documents submitted by the provider in determining whether approval for the DME should be granted. If prior authorization was granted, then the provider could deliver the DME to the Medicaid beneficiary and submit a claim to ACS.

12. Claims for payment of DME supplies were submitted to ACS using the form CMS-1500. Such forms were either submitted electronically or on paper, either by the DME provider or by a third-party billing company hired by the DME provider to submit the claims. If the DME was ordered by a physician, was reasonable and necessary, and met all other DC Medicaid criteria for coverage, then ACS would pay the DME provider, based on the information submitted on the CMS-1500.

13. On or about January 4, 2006, EMERALD signed and submitted a Medicaid Provider Agreement to DC Medicaid whereby EMERALD agreed to provide healthcare services to District of Columbia Medicaid beneficiaries. The sole signatory on behalf of EMERALD was ODUNZEH, who also identified himself as the Chief Executive Officer and sole owner of EMERALD. The provider agreement stated, among other things, "I/We agree that the receipt by the D.C. Medicaid program of the first and each succeeding claim for payment from me/us will be the Medicaid's understanding of my/our declaration that the provisions of this Agreement and supplemental providers manuals and instructions have been understood and complied with[.]"

14. Providers of health care items and services such as DME companies used uniform systems of coding on the CMS-1500 to report DME that they provided to Medicaid beneficiaries. For DME, the system of coding was known as the Health Care Financing Administration Common Procedure Coding System, and was commonly referred to as the "HCPCS" code. Each different item of DME was assigned a specific alphanumeric code that providers used when submitting claims to ACS.

15. On each CMS-1500 EMERALD submitted or caused to be submitted to ACS, EMERALD had to identify, among other things, the name of the physician prescribing the DME, the quantity of DME that was provided, the date the DME was delivered to the beneficiary, and

the specific HCPCS code for that kind of DME. DC Medicaid, through ACS, paid for each DME based on a pre-determined fee schedule.

### Power Wheelchairs

16. There were a number of HCPCS codes for power wheelchairs. The following four HCPCS codes and their accompanying definitions were relevant to this case:

- K0822: "power wheelchair, group 2 standard, sling/solid seat/back, patient weight capacity up to and including 300 pounds";

- K0823: "power wheelchair, group 2 standard, captains chair, patient weight capacity up to and including 300 pounds";

- K0825: "power wheelchair, group 2 heavy duty, captains chair, patient weight capacity 301 to 450 pounds" and

- K0011: "standard-weight frame motorized/power wheelchair with programmable control parameters for speed adjustment, tremor dampening, acceleration control and braking".

17. DC Medicaid paid providers different amounts for each wheelchair. For K0822 and K0823 – both basic power wheelchairs – DC Medicaid paid approximately $3,218 for each wheelchair. For K0825, DC Medicaid paid approximately $3,546 per wheelchair. For K0011, the most expensive wheelchair, DC Medicaid paid approximately $6,157 for each wheelchair.

### Incontinence Supplies

18. In addition to power wheelchairs, EMERALD also submitted claims to ACS for certain adult incontinence supplies. As relevant to this case, EMERALD billed for the following HCPCS codes:

- A4520: "incontinence garment, any type (e.g., brief, diaper, liner), each";

5

- A4554: "disposable underpads (e.g., chux), all sizes"; and
- A4927: "gloves, non-sterile, per 100".

19. Based on the established fee schedule, DC Medicaid typically paid DME providers $0.90 for each A4520 incontinence garment, $0.35 for each A4554 disposable underpad, and $6.00 for each box of 100 A4927 gloves.

### Scheme to Defraud

20. From on or about January 8, 2008, through on or about March 18, 2011, EMERALD submitted to DC Medicaid approximately 6,111 CMS-1500 claim forms totaling approximately $4,129,929.61, for various DME that EMERALD claimed to have provided to Medicaid beneficiaries, including power wheelchairs and disposable adult incontinence supplies.

21. Based on those submitted claims, Medicaid paid EMERALD approximately $2,047,282.25.

#### *Power Wheelchairs*

22. Of those 6,111 submitted claims, 100 were for K0011 power wheelchairs that EMERALD claimed to have provided to Medicaid beneficiaries. EMERALD typically billed DC Medicaid $6,157.98 for each K0011 wheelchair, for a total of approximately $591,653.35.

23. Based on those submitted claims, DC Medicaid, through ACS, paid EMERALD approximately $480,272.76. (ACS denied payment for 21 of the claims.)

24. However, EMERALD never provided K0011 power wheelchairs to Medicaid beneficiaries. Instead, for each K0011 power wheelchair EMERALD billed to DC Medicaid, EMERALD provided a much less expensive, more basic K0822 or K0823 power wheelchair.

25. Based on EMERALD's false claims submitted to DC Medicaid, DC Medicaid paid EMERALD approximately $232,470 more than what EMERALD might otherwise have been entitled to for the wheelchairs EMERALD actually delivered.

26. However, for Medicaid beneficiaries that were also enrolled in Medicare – meaning Medicare was the primary payor and DC Medicaid was the secondary payor – and for patients who were only enrolled in Medicare and *not* Medicaid, EMERALD (in its DC location) never submitted a claim for a K0011 wheelchair; all of those claims were for K0822, K0823, and K0825; unlike the Medicaid-only patients, the wheelchair claims EMERALD submitted to Medicare and Medicaid for these patients apparently matched up with the wheelchairs that EMERALD actually delivered.

*Incontinence Supplies*

27. In addition, during the same time period, EMERALD submitted numerous claims to DC Medicaid for adult disposable incontinence supplies that it never provided.

28. For example, from on or about January 16, 2008, through on or about March 18, 2011, EMERALD submitted to DC Medicaid approximately:

- 388 claims for 87,107 incontinence garments, code A4520, totaling $84,264.99;
- 81 claims for 23,800 disposable underpads, code A4554, totaling $9,955.00; and
- 34 claims for 232 boxes of 100 gloves each, code A4927, totaling $1,310.

29. However, EMERALD in fact only provided less than half of what it claimed to DC Medicaid. Specifically, from the above claims, EMERALD only provided approximately 42,236 of the 87,107 A5420 incontinence garments; 11,736 of the 23,800 A4554 disposable underpads; and 68 of the 232 boxes of A4927 gloves.

7

30. DC Medicaid paid EMERALD $44,913.74 for these DME supplies that it never delivered.

## COUNT ONE

### (Conspiracy to Commit Health Care Fraud)

31. Paragraphs 1 through 31 are incorporated by reference and realleged as though fully set forth herein.

32. From on or about January 16, 2008, through on or about March 18, 2011, in the District of Columbia and elsewhere, defendant, UCHE BEN ODUNZEH, did knowingly and willfully execute or attempt to execute the above-described scheme or artifice (1) to defraud the District of Columbia's Medicaid program, which is a health care benefit program as defined in Title 18, United States Code, Section 24(b); and (2) to obtain by means of false or fraudulent pretenses, representations, or promises, namely, false claims, money and property owned by the District of Columbia's Medicaid program, in connection with the delivery of or payment for health care benefits, items, and services.

## CRIMINAL FORFEITURE ALLEGATION

### (Criminal Forfeiture, in violation of Title 18, United States Code, Section 982(a)(7))

33. The violation alleged in Count One of this Information is re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982(a)(7).

34. As a result of the offense alleged in Count One of this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

35. The property subject to forfeiture includes, but is not limited to:

8

**Money Judgment:**

judgment in favor of the United States of America for $277,383.74, which is equal to the value of the property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense in Count One.

36. By virtue of the commission of the felony offense charged in Count One of this Information, any and all interest the defendant has in any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(7).

37. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the said defendant:

    (1) cannot be located upon the exercise of due diligence;

    (2) has been transferred or sold to, or deposited with, a third party;

    (3) has been placed beyond the jurisdiction of the Court;

    (4) has been substantially diminished in value; or

    (5) has been commingled with other property that cannot be subdivided without difficulty;

9

then it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the said defendants up to the value of the property listed above as being subject to forfeiture.

Dated: September 5, 2012

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

By: _____
Theodore L. Radway (DC Bar No. 473034)
Assistant United States Attorney
555 4th Street, NW
Washington, DC  20530
Tel: 202.252.7874
Fax: 202.307.2304
ted.radway@usdoj.gov