**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **Criminal No. 12-cr-00195-ESH** |
| **v.** ) | |
| ) | |
| **UCHE BEN ODUNZEH,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing. For the reasons set forth herein, the Government requests that the Court sentence the defendant to a period of incarceration at the high end of the Plea Agreement's Stipulated Guidelines Range of 18 to 24 months; and order restitution to the victim, the District of Columbia's Medicaid program, in the agreed-to amount of $277,383.74.

### I.   FACTUAL SUMMARY

#### A.   Defendant's Ownership and Control Over Emerald Medical Services

In September 2005, defendant registered Emerald Medical Services, LLC ("**Emerald**") to do business in the District of Columbia. On or about August 15, 2008, defendant also caused **Emerald** to register to do business in Virginia. **Emerald** was a supplier of durable medical equipment ("DME"), such as power wheelchairs and incontinence supplies like adult diapers. On or about January 4, 2006, defendant Uche Ben Odunzeh ("**Odunzeh**") submitted a provider application and enrollment agreement to the District of Columbia's Medicaid program, seeking to have **Emerald** enrolled as a provider in Medicaid. That application and enrollment agreement identified **Emerald** as a sole proprietorship with **Odunzeh** as **Emerald**'s sole owner and the

only person or entity with any "direct or indirect ownership or a controlling interest", as well as **Emerald**'s chief executive officer, controller, and administrator.  The Medicaid application and enrollment agreement further identified **Odunzeh** as having sole control and signature authority over **Emerald**'s bank account, and as the only person at **Emerald** entitled to receive payments from Medicaid.  **Emerald**'s public filings with the District of Columbia and Virginia also identified **Oduzneh** as **Emerald**'s registered agent, and as the sole organizer of the limited liability company.

**Odunzeh** also completed and submitted an application for **Emerald** to be a supplier in the Medi*care* program; **Odunzeh** made similar representations in that application regarding his exclusive ownership and control over **Emerald** as he had made in the Medicaid application described above.  However, on or about April 7, 2010, Medicare sent notice to **Emerald** that because **Emerald** had failed an on-site inspection and had failed to provide any proof of compliance with numerous regulatory requirements, Medicare was going to revoke **Emerald**'s supplier number – a drastic measure that would mean **Emerald** could no longer submit claims to or be paid by Medicare.  (Because **Emerald** had obtained different supplier numbers for its DC and Virginia locations, only the Virginia operations were in dispute.)

Specifically, and as relevant to the case at bar, **Emerald**'s Medicare supplier number was revoked primarily because **Emerald** did not provide Medicare with timely proof that it had actually purchased the power wheelchairs for which it billed Medicare more than $53,264.[1] (This revocation is mentioned in the Final Presentence Investigation Report at footnote 4.)  In appealing the revocation to the U.S. Department of Health and Human Services Departmental

---

[1] The opinion of the U.S. Department of Health and Human Services Administrative Law Judge – affirming the revocation of **Emerald**'s Medicare supplier number – goes into detail about the history of the case and **Oduzneh**'s actions and knowledge in that matter; the opinion is publicly available at: http://www.hhs.gov/dab/decisions/civildecisions/cr2328.pdf.

Appeals Board, **Odunzeh** submitted an affidavit (Exhibit 6, as referenced in the ALJ opinion) in which **Odunzeh** acknowledged being the "owner and managing member" of **Emerald**, and admitted that he was "involved in the management of Emerald and am familiar with the books and records of Emerald."

In sum, it is undisputed that defendant **Odunzeh** had sole ownership and complete control over **Emerald** and its finances.

### B.    Emerald's Health Care Fraud

The specifics of **Emerald**'s Medicaid fraud are set forth in the Superseding Information and the Statement of Offense.  Generally, from January 2008 through March 2011, **Emerald** submitted at least 100 false claims to Medicaid, totaling $591,653.35, for power wheelchairs that it did not purchase and did not provide to Medicaid recipients as claimed.  Specifically, **Emerald** billed Medicaid for the K0011 power wheelchair – the wheelchair that Medicaid paid the highest amount for – rather than the much more simple and much less expensive wheelchairs that **Emerald** actually did provide, a fraudulent billing practice known as "upcoding."  This fraudulent billing scheme resulted in Medicaid paying **Emerald** approximately $480,272.76 for upcoded power wheelchairs that it did not provide as claimed.  Because the actual wheelchairs **Emerald** did provide were so much cheaper, **Emerald** obtained from Medicaid at least $232,470 more than it was entitled to, assuming it had billed the wheelchairs correctly.

However, Medicaid had an extensive pre-authorization process in place for power wheelchairs.  As described in the related-case indictment of Patricia Chisanga, **Odunzeh**'s alleged co-conspirator at **Emerald** and a woman with whom **Odunzeh** recently fathered a child, **Emerald** was only able to obtain payments for the upcoded wheelchairs by falsifying the doctors' prescriptions and orders, using white-out to change or add the K0011 code even when

the doctor specifically ordered a lower-level wheelchair, and/or adding medical justifications for the wheelchair that the doctors had not included but making it look like the doctors had written the justifications. *See U.S. v. Chisanga*, 12-cr-00241-ESH. Without those falsified documents and medical justifications added by **Emerald** and not the prescribing doctors, it is impossible to know if Medicaid would have approved the power wheelchairs at all, at any level. It is thus impossible to know with certainty the exact amount of money that **Emerald** would actually have been entitled to from Medicaid, *if any* (*i.e.*, and therefore impossible to determine the actual loss to Medicaid above a certain level), and so the $232,470 described in the previous paragraph is the <u>minimum</u> amount of fraudulent overpayments obtained by **Emerald**; it is possible that Medicaid would have denied some of the claims entirely and that the loss amount would therefore have been higher.

In addition to the power wheelchair fraud, **Emerald** also submitted fraudulent claims to Medicaid for a substantial amount of incontinence supplies that it never provided. The Government's initial review of only some of **Emerald**'s claims established that **Emerald** billed Medicaid at least $44,913 for tens of thousands of various adult incontinence DME supplies that it never provided to Medicaid recipients.

    C. **<u>Defendant's Arrest and Plea</u>**

As referenced in the Final Presentence Investigation Report ("PSR") (paragraph 17) and other court documents, defendant **Odunzeh** was arrested at Baltimore-Washington International Airport on July 15, 2012, as he was waiting to board a flight to Nigeria. In his possession, amongst the five large bags of luggage he was carrying, was a copy of the "target" letter given to his alleged co-conspirator, Chisanga, informing her of the Government's investigation of **Emerald**'s health care fraud and inviting her to a meeting at the U.S. Attorney's Office two days

after **Odunzeh**'s scheduled flight out of the United States.  **Odunzeh**'s arrest was precipitated by an anonymous call to the Federal Bureau of Investigation, in which the caller specifically identified **Odunzeh** and Chisanga and **Emerald** by name, referenced the fraud investigation, and stated that the two were fleeing the country in advance of the scheduled meeting the following week (the meeting referenced in Chisanga's letter).[2]

On October 9, 2011, **Odunzeh** pled guilty to a one-count superseding information charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 and § 1347.

## II.     SENTENCING GUIDELINES CALCULATIONS

In the plea agreement signed by the defendant and his attorney, the parties agreed that the defendant's stipulated offense level is 15 under the United States Sentencing Guidelines.  That level was calculated by applying the Guidelines § 2B1.1(a)(1), with a base offense level of six (6).  The parties then added 12 levels under § 2B1.1(b)(1)(G) for the specific offense characteristic of a loss more than $200,000.  That resulted in an offense level of 18.  Next, the parties agreed that a 3-level reduction was appropriate based on defendant's acceptance of responsibility and his timely notification to the Government of his intention to plead guilty.

In accordance with the above stipulated calculations, the applicable Stipulated Guidelines Offense Level is 15, resulting in a Stipulated Guidelines Range of 18 to 24 months.  Under the plea agreement, the parties further agreed "that a sentence within the Stipulated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a)."  However, the plea agreement permits the defendant to argue for a sentence outside of the Stipulated Guidelines Range, based solely upon the factors to

---

[2] Chisanga had already fled the country on a one-way ticket to Ethiopia and continuing to Zambia when the anonymous call was received; a warrant has been issued for her arrest, based on her indictment.

be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a) or pursuant to *U.S. v. Smith*, 27 F.3d 649 (D.C. Cir. 1994).

### III.     STATUTORY SENTENCING FACTORS

In addition to the parties' agreement that the Stipulated Guidelines Range is reasonable in light of the § 3553(a) factors, an independent analysis and application of those factors also support a sentence of incarceration within the Stipulated Guidelines Range of 18 to 24 months.

Section 3553(c) provides that the District Court at the time of sentencing shall state in open court the reasons for its imposition of a particular sentence. Section 3553(a) sets out the factors to be considered:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established for the . . . offense . . . as set forth in the guidelines . . . ;

(5)  any pertinent policy statement issued by the Sentencing Commission . . . ;

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  While the District Court must consider the goals of Section 3553 in determining the appropriate sentence, the Court is not required to specifically refer to each factor listed in § 3553(a).  *See United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005).  Examination of the relevant factors here all support a sentence within the Stipulated Guidelines Range.

    A.    <u>**Nature of the Offense**</u>

**Emerald** used a number of fraudulent schemes to steal *at least* $277,000 from Medicaid – a program designed to provide health services and benefits to some of society's most vulnerable members, the poorest of the poor.  The money defendant conspired to and did steal is money that is not available to pay for legitimate care and services actually needed by Medicaid recipients.  Further, the health care fraud scheme that defendant conspired to effect was not a one-time act; over a period of approximately three years, defendant's conspiracy resulted in **Emerald** submitting over 100 individual false claims for power wheelchairs that it did not provide as claimed, and hundreds if not thousands of other false claims for adult incontinence DME supplies that **Emerald** simply did not provide.  Notably, the fraudulent billing only stopped in March of 2011 – when the search warrant was executed at **Emerald** and defendant first learned of the Government's investigation of his fraudulent activities.

Moreover, this was clearly not a case of mistaken billings or lack of knowledge.  This conduct required the defendant to conspire and engage in substantial planning and subterfuge so **Emerald** could obtain the pre-authorization necessary to submit the false claims to Medicaid.  As alleged in the related-case indictment of **Odunzeh**'s co-conspirator, **Emerald** modified every single doctor's order and prescription for a power wheelchair – after they were signed by the physician – in order to get pre-authorization from Medicaid.  In addition, evidencing knowledge

and criminal intent, as **Odunzeh** admitted in the Statement of Offense (¶ 26), **Emerald** only submitted false, upcoded wheelchair claims for those individuals who had Medicaid – this was in stark contrast to when individuals had both Medicaid and Medicare, or just Medicare, in which case **Emerald** only submitted claims for the actual, cheaper wheelchair it delivered, <u>evidencing a clear knowledge of how the billing system works and a clear criminal intent to deceive Medicaid</u>. And as described above, Medi*care* revoked **Emerald**'s supplier number in Virginia because **Emerald** (through **Odunzeh**) could not prove that it actually bought and provided the power wheelchairs it billed to Medicare; since **Odunzeh** was personally involved in that entire process and appeal, he obviously had knowledge of that wrong-doing at **Emerald** as well.

Moreover, as the sole owner, CEO, controller, and administrator of **Emerald**, and the only one who had control over the bank account into which all the Medicaid payments went, it is entirely appropriate and just that **Odunzeh** be held responsible for all of **Emerald**'s wrongful conduct (especially where there were only two other employees: one was the driver not involved in paperwork or billing and the other was **Emerald**'s indicted alleged co-conspirator, with whom **Odunzeh** had a child).

    **B.**    **<u>Defendant's Characteristics</u>**

This defendant was not lacking in education or lawful career opportunities. As described in the PSR, **Odunzeh** was in college in his native Nigeria and then finished his Bachelor of Arts degree in economics after he came to America (although since the degree was obtained in 2008, **Odunzeh** obtained that degree while unlawfully in the United States). He then claimed to have a series of jobs, and owns or is connected to several companies. He is <u>not</u> an unskilled individual with no opportunities for gainful, lawful employment.

## C. The Need for the Sentence to Reflect the Seriousness of the Offense

Defendant's punishment should be just, and should take into account the seriousness of the offense – stealing hundreds of thousands of dollars from the Medicaid program, thereby depriving Medicaid of that money to provide to poor and indigent sick people who need medical benefits and services – as well as the need for deterrence and to promote respect for the law.

In 2010, Congress enacted the Patient Protection and Affordable Care Act ("PPACA"), which among other things specifically "directed the Sentencing Commission to review the Guidelines and policy statements for health care fraud offenses to ensure that they 'reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud' and to provide 'increased penalties for persons convicted of health care fraud offenses in appropriate circumstances.'" *U.S. v. Mateos*, 623 F. 3d 1350, 1368 (11th Cir. 2010) (affirming upward variance); PPACA, Pub. L. No. 111-148, § 10606(a)(3)(A), 124 Stat. 119 (March 23, 2010). Congress also directed the Sentencing Commission to enhance the penalties even further where the fraud impacted a Government health care program. *Id.*, 10606(a)(2)(C).[3] Congress's intent is clear: health care fraud crimes must be punished severely enough to reflect the seriousness and widespread nature of the problem plaguing the country today. A sentence at the high end of the Stipulated Guidelines Range would achieve that result and fulfill the intent of both Congress and the Sentencing Commission.

---

[3] Congress also directed the Commission to clarify that when the health care fraud impacts a Government health care program, "the aggregate dollar amount of fraudulent bills submitted . . . shall constitute *prima facie* evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1 app. Note (3)(F)(viii). This is the methodology used by Probation to determine the applicable Guidelines range, which resulted in a final offense level of 17, two levels above the Stipulated Offense Level found in the plea agreement. Defendant has introduced no evidence rebutting the presumption of intended loss amount. Further, as described above, Probation's reasoning in using the billed amount for the intended loss supported by case law, and is the clear Congressional intent as reflected in PPACA and the current Guidelines. However, the Government also notes that, as is stated in the plea agreement, which here binds the Government, the stipulated offense level calculated in the plea agreement is a "reasonable sentence" under the Guidelines.

**D.    Kinds of Sentence Available; Established Sentencing Range; Policy**

The statutory maximum for conspiracy to commit health care fraud in this case is ten years. The Stipulated Guidelines Range of 18 to 24 months is well within the statutory maximum. Moreover, as noted above, in the plea agreement the parties stipulated "that a sentence within the Stipulated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a)." Also as described above, a sentence within the Stipulated Guidelines Range would fulfill the stated purpose of the health care fraud Sentencing Guidelines and recent Congressionally-mandated enhancements.

**E.    The Need to Provide Restitution**

In cases of health care fraud, restitution to the victim is required under 18 U.S.C. § 3663A(a) (the Mandatory Victim Restitutions Act of 1996). Here, in the plea agreement, the defendant agreed to pay restitution to the victim Medicaid program in the amount of $277,383.74. However, according to the Government's investigation and the PSR, defendant has already spent most of the proceeds of the fraud or sent it overseas, and Medicaid will likely never recover most of those fraudulently obtained funds. Medicaid's need for restitution, and defendant's apparent inability to provide that mandatory restitution because the funds have been spent, should also be considered by the Court in determining the appropriate sentence.

In summary, a sentence of 24 months, at the high end of the Stipulated Guidelines Range of 18-24 months, along with an order of restitution, is reasonable as agreed to by the parties and independently under the § 3553(a) statutory factors as applied to this case.

**IV.    A *SMITH* DEPARTURE IS NOT APPROPRIATE**

Defendant has previously requested that the Government consent to a departure under *U.S. v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), because defendant faces deportation from the United

States. The PSR also notes that a downward departure "may" be appropriate under *Smith*. PSR ¶¶ 134-35. However, the Government does not agree that a downward departure under *Smith* is appropriate. First, in *Smith*, the court did not approve a downward departure because the defendant was a deportable alien; it merely authorized the sentencing court to consider that factor in determining the sentence, noting that it "may be appropriate" but also stressing "<u>that such departures will be 'highly infrequent'</u>." *Smith*, 27 F.3d at 655 (emphasis added). Second, *Smith* involved a defendant who entered the country illegally, and committed a narcotics-related crime. *Id.* at 650. Even if Smith had not been convicted of a crime he would still have been subject to deportation for illegal entry into the United States. By contrast, defendant **Odunzeh** entered the United States lawfully, but chose to remain in the country well after his visa expired – apparently to earn a bachelor's degree and to conduct health care fraud.

Although defendant maintains he is still here lawfully, he has offered no proof to support that claim, and according to the Government's inquiries and Immigration and Custom Enforcement ("ICE") records, as noted in the PSR, defendant is not in the country lawfully as his visa expired in 2004. Had defendant not conspired to commit health care fraud and gotten caught, he might never have come across ICE's radar. If defendant **Odunzeh** is here lawfully as he claims, then unlike in *Smith*, he would be subject to deportation solely because of his crime, not because of any illegal status. In which case, as the *Smith* court noted, "as the defendant's status as a deportable alien is by no means necessarily unrelated to his just deserts, even a court confident that the status will lead to worse conditions should depart only when persuaded that the greater severity is undeserved." Id. at 655. Here, defendant's "status as a deportable alien" **is** directly related to his "just deserts," in that his commission of the crime is the only thing that got him caught – and if as he claims he is here lawfully, it is the only thing that would subject him to

11

deportation – and so any "greater severity" incurred by defendant serving an extra six months in prison is entirely of defendant's own doing and just punishment for his crime. Even if defendant is here unlawfully, such that his crime is unrelated to his potential deportation, there is nothing about defendant's case that would constitute the "highly infrequent" scenario that would justify cutting short the term of incarceration.[4]

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court sentence the defendant to a period of incarceration at the high end of the Stipulated Guidelines Range of 18 to 24 months, and order restitution in the stipulated amount of $277,383.74, paid to the District of Columbia.

Dated: January 3, 2013

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

By: /s/ Theodore L. Radway
Theodore L. Radway (DC Bar #473034)
Assistant United States Attorney
555 4th Street, NW
Washington, DC  20530
Tel:  202.252.7874
Fax: 202.307.2304
ted.radway@usdoj.gov

---

[4] The PSR discussed defendant's medical conditions, which apparently are the result of his own conduct or substance abuse. At the last Court hearing, defendant's family expressed concern to the Government about defendant's access to medical care. The Government has no objection to defendant being sentenced to a period of incarceration at an appropriate Bureau of Prisons facility or medical facility at which defendant can receive any and all needed medical care and treatment.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of January, 2013, I have caused a copy of the foregoing Government's Memorandum in Aid of Sentencing to be filed electronically and served via CM/ECF upon counsel for the defendant, John O. Iweanoge, II, and by fax or email upon United States Probation Officer Kelly Kraemer-Soares.

/s/ Theodore L. Radway
Theodore L. Radway
ASSISTANT U.S. ATTORNEY